MARIANNA BUNICONTRA, ADMINISTRATRIX *AD PROSE-QUENDUM* OF DIULIO MARTINO, DECEASED, PLAIN-TIFF-APPELLANT, v. FRANCIS A. DUVAL, DEFEND-ANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 10, 1958—Decided January 20, 1959.

Before Judges PRICE, SCHETTINO and HALL.

*Mr. Harry Chashin* argued the cause for plaintiff-appellant (*Messrs. Marcus & Levy,* attorneys).

*Mr. Louis Santorf* argued the cause for defendant-respondent (*Mr. J. Chester Massinger,* attorney).

The opinion of the court was delivered by

PRICE, S. J. A. D.   Plaintiff instituted this action in the county court, law division, as administratrix *ad prosequendum* to recover damages for the death of her husband Diulio Martino, who drowned while a patron of defendant on the latter's premises operated by him commercially as a recreational area.   Martino's death was alleged by plaintiff to have been caused by defendant's negligence.   At the conclusion of the presentation of plaintiff's evidence on liability the trial court granted defendant's motion for involuntary dismissal, *R. R.* 4:42–2(*b*).   Plaintiff appeals from the judgment entered thereon.

In considering the foregoing motion the trial court was obliged to accept as true all evidence supporting the position of plaintiff and to accord to her the benefit of all inferences in her favor which might "logically and legitimately be drawn therefrom." *Bergquist v. Penterman,* 46 *N. J. Super.* 74, 82 (*App. Div.* 1957) ; *DeRienzo v. Morristown Airport Corp.,* 28 *N. J.* 231, 239 (1958).

So considered, the evidence produced by plaintiff revealed that on July 9, 1955 defendant was the owner of property at Pompton Lake in Wayne Township which he operated for boating, swimming and picnicking.   The area was equipped with a diving board, raft and a dock for boats. A fee of 25 cents was charged by defendant for admission

to the property. The fee included compensation for the use of the swimming facilities. The premises were open to the public.

The lake front comprised three general areas. The bathing beach area, located in a cove, extended from 90 to 120 feet along the shore of the lake. The water was shallow near the shore line and increased gradually in depth. To the left of the beach was the boating area, bordered by a concrete wall or cribbing to which boats could be tied. Estimates of the width of this area along the shore varied from 75 to 120 feet. To the left of the boat area was a deeper swimming area, equipped with a diving board which projected from the shore out over deep water. The depth of the water in this area increased rapidly from the shore line to a total of about 15 feet at a distance of 15 to 20 feet from the shore. The raft was located in deep water about 50 feet from the diving board.

An elevated chair or stand, provided for the use of the only lifeguard employed by defendant, was located on the beach near the boundary between the beach and boating areas. It faced the lake, but at an angle with the shore line. It was so placed that when the lifeguard was using the chair his view, encompassing the bathing beach area, was approximately 30 degrees to his right and away from the diving area. The chair's "position" was "selected" by defendant.

Defendant's lifeguard testified that, while sitting in the chair, if he turned his head to the left, he could see the diving area but some trees located along the shore bordering on the intervening boating area partially interfered with his view in that direction; that he had to bend forward and backward in order to scan all of that water area. He was interrogated with reference to his duties as outlined to him by defendant as follows:

"Q. Will you describe what your duties were with Mr. Duval or working with him, with regard to what places you were supposed to watch?

A. I was supposed to watch the beach area. At times I would go into the boating area; or wherever somebody were drowning, or wherever somebody needed help.

\* \* \* \* \* \* \* \*

Q. How about the diving-board area, were you guarding that as you sat in that chair? A. I would glance down there to see if there was any trouble. I didn't walk down there, unless I saw something irregular."

He further testified as follows:

"\* \* \* My station was to be at the chair which is indicated. I was allowed to roam the beach as I saw fit. There was nothing mentioned to me that I should go down to the diving-board area; just to wander down there. But it was mentioned that I should keep the children away from the diving-board, and any poor swimmers which I saw.

\* \* \* \* \* \* \* \*

Q. Now, generally speaking, were you guarding this diving-board area? A. By guarding, do you mean was I going down there physically?

Q. Yes. A. Generally I didn't go down there physically."

He said he "guarded" the beach area "specifically"; that the defendant's instructions to him were to "go and guard the beach area because that's where I would expect the trouble." He added: "The idea, I received from Mr. Duval, was, I should guard the beach area more than any other area, because that's where I could expect to have trouble." On cross-examination by defendant's counsel he answered affirmatively the question as to whether it was part of his job to "guard" any one who was on the Duval premises whether in "the boating area, the beach or the diving area." He was then interrogated as follows:

"Q. Was it your job to be a life-guard for only one part of this area? A. It was my job to be stationed there. But I was to save anybody at any place.

\* \* \* \* \* \* \* \*

Q. Let me ask you this point-blank. As the life-guard there, on station there, was there ever an occasion during the season, or during the week, did you walk up and down all this area, patroling [patrolling] it? A. I would. Very seldom."

On July 9, 1955 Martino, in the company of August Alvino and Ernest DiLizio, went to defendant's premises for a day's outing. Martino, who could not speak English, originally became acquainted with DiLizio in Italy. He had not previously known Alvino. Alvino and DiLizio could speak English but not fluently.

The three paid the required admission fee, donned bathing suits in a building provided by defendant for that purpose and went to the diving area. DiLizio entered the water first and soon emerged. He then re-entered the water and Martino followed. DiLizio testified that while both were swimming a short distance from shore he heard someone splashing behind him. He did not turn immediately but called to the person to desist. Moments later he turned and failed to see the decedent. He became frightened and as he left the water heard a scream from the water area. He then called for help.

Alvino, however, testified that he heard decedent call for help in Italian while DiLizio was still in the water; that he, Alvino, entered the water and swam toward Martino but the latter sank before he could be reached. Alvino returned to the shore and called for help in English.

John Cooper, employed by defendant as a boatman, testified that on the day in question he was at the boat dock about 65 feet from the diving board when someone ran toward him and when about 15 feet distant "hollered" that a man had drowned. Cooper "hollered" to the lifeguard who was then on his stand. They ran toward each other and Cooper told the lifeguard that "a man drowned." Cooper and the lifeguard then ran to the diving area. The lifeguard entered the water but was unsuccessful in his efforts to recover Martino's body, which was thereafter located by another person not associated with defendant. The body was found about 15 or 20 feet from the shore at a place where the water was 12 to 15 feet in depth.

The trial court erred in its dismissal of the action on defendant's motion at the end of the presentation of plaintiff's evidence as to liability. The evidence presented estab-

lished that plaintiff's decedent was a business invitee of defendant. Defendant "was under a duty to use reasonable care for the safeguarding and protection" of his patrons in their use of the swimming facilities. *Lipton v. Dreamland Park Co.*, 121 *N. J. L.* 554, 555 (*E. & A.* 1939). In dismissing the case the trial judge held that the *Lipton* case, *supra*, was not controlling because there was evidence in the cited case that "the lifeguard violated his duties," while in the case at bar he determined that: (a) "[t]here was no evidence that the lifeguard was not performing his duties properly on this date"; (b) "[t]here has been no evidence to show that the precautions taken by the defendant deviated from any prescribed standard of care established for a business of this type"; (c) "[t]here is no evidence to show that the defendant breached any standard of care established as a proper standard for this business or by ordinary usage or custom, or by any regulations of a governmental agency as to an adequate or inadequate number of life-guards." The trial court stated that "it would be wrong and improper to allow a jury to speculate upon what the obligations are of a defendant in this case without some proof of any prescribed standard, other than the standard of using ordinary reasonable care that I have mentioned." The court then determined that it found "no evidence of negligence which requires the defendant to go forward in his defense."

█ Considering the evidence in the light most favorable to plaintiff, jury questions were presented as to whether defendant exercised reasonable care: (a) in his selection of the site for the lifeguard's chair, having regard to the size, extent and location of the widely separated water areas to be supervised and the partial interference of the lifeguard's view of the diving board area by the presence of the row of trees in the boating area; or (b) in his location of the chair, at an angle, on the shore of the bathing beach area, resulting in the lifeguard's attention being concentrated primarily on the bathing beach area as distinct from the diving board area; or (c) in his instructions to the lifeguard

as to his duties in view of the size, extent and location of the water recreational areas.

The trial court stressed the lack of proof of any standard "as to adequate or inadequate number of lifeguards." In a case of this type we believe that the adequacy of lifeguard protection, as to the number of lifeguards needed, should be based on expert testimony in the absence of any specific regulation referable thereto, *cf. Shafer v. H. B. Thomas Co.*, 53 *N. J. Super.* 19 (*App. Div.* 1958), but the action should not be dismissed for lack of such testimony if it can reasonably be inferred from the evidence adduced that defendant failed to exercise ordinary care in other aspects, such as are hereinabove set forth, as to which expert testimony was not essential.

It was also for the jury to determine whether at the time of the fatal accident the lifeguard, at the distance of his stand location from the diving board area, was making reasonable observation of that area, in which he knew persons were swimming, and whether in the exercise of due care he should have responded to the cries and commotion emanating from that area. There was evidence, the quality of which was for the jury to assess, that decedent had been swimming in deep water for several minutes before he drowned; that there was extensive splashing of water; there were screams and calls for help in the Italian and English languages; Martino's arm was raised above the water as he went beneath its surface; and Alvino swam to within four feet of decedent before the latter disappeared from sight. All of this activity was unnoticed by the lifeguard. He remained unaware of any untoward occurrence until alerted by the boatman. It was for the jury to determine whether the lifeguard exercised reasonable care in the performance of his duty under these circumstances.

The judgment is reversed and a new trial ordered, costs to abide the event.